ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| Kostas Greek Food - Zorbas | ) ASBCA No. 62213 |
| | ) |
| Under Contract No.  KO190001 | ) |

APPEARANCE FOR THE APPELLANT:      Mr. Georgios Kostas
                      Owner

APPEARANCES FOR THE GOVERNMENT:    Scott N. Flesch, Esq.
           Army Chief Trial Attorney
         CPT Philip L. Aubart, JA
          Trial Attorney

OPINION BY ADMINISTRATIVE JUDGE CATES-HARMAN

This appeal arises from a termination for default of an Army and Air Force Exchange Service (AAFES) contract awarded to Kostas Greek Food – Zorbas (appellant; contractor; Kostas) to provide a mobile kebab food concession at U.S. Army Garrison Humphreys in South Korea (Humphreys, Korea).  The contract was terminated for default for appellant's failure to meet several contractual deadlines. The parties elected to submit the appeal on the record pursuant to Board Rule 11.  The government submitted a Rule 11 brief.  The appellant chose not to submit a brief. Because we find Kostas's unexcused failure to obtain the required permits and licenses within the period set forth in the contract, as amended, provided an adequate basis for the default termination, we deny the appeal.

FINDINGS OF FACT[*]

1.  Contract No. KO190001 (contract) was awarded on March 5, 2019, to appellant by the AAFES, Korea Contract Office, to provide a mobile kebab food concession at Humphreys, Korea, for a period of two years commencing March 15, 2019 (R4, tab 1 at 1, 5).

---

[*] Our presentation of the background facts focuses on the facts surrounding the termination.  Due to appellant's decision to forgo filing a Rule 11 brief, Kostas has not disputed the government's recitation of facts, and we use them selectively and add additional facts we deem material based on the record.

2. The contract required Kostas to have obtained "all necessary permits and licenses" and to comply with applicable laws; the relevant section reading in full text:

> PERMITS, LICENSES AND APPLICABLE LAWS
>
> Contractor warrants that all necessary permits and licenses have been obtained and that the merchandise, services, supplies, and/or equipment provided under this contract are in compliance with applicable laws. Contractor agrees to comply with all federal and state security and breach laws, privacy laws and regulations that cover the collection and use of personal information or data.

(R4, tab 1 at 12)

3. The contract's General Provisions included Business Permits for Host Countries, requiring the offeror to obtain all necessary permits and licenses to operate in South Korea before contract performance. The clause reads in full:

> Offeror certifies by submission of proposal and/or acceptance of a contract that he will obtain all necessary permits and licenses relative to operating in the country in which contract will be performed prior to contract performance. The burden of determining applicability of host country business requirements is strictly concessionaire's responsibility and will not give rise to any claim against the Exchange or a basis for adjusting terms and conditions of the contract.

(R4, tab 1 at 21)

4. The contract required Kostas to supply equipment as follows:

> EQUIPMENT, FURNITURE, AND MOVABLE TRADE FIXTURES (NOV 15).
>
> . . .
>
> b. Concessionaire Furnished: Concessionaire will provide and install all the equipment, furniture and movable trade fixtures required by this contract. All concessionaire

furnished property is subject to approval of the contracting officer.

(R4, tab 1 at 26)

5. Exhibit G of the contract required Kostas to supply a "Self-Contained Mobile Food Unit" (foodservice truck) that meets commercial food industry standards (R4, tab 1 at 46).

6. The contract included a Contractor Liability Services clause, which stated, in part:

> Contractor will not be liable for incidental or consequential damages if the failure to perform arises out of causes beyond the control and without the fault or negligence of the contractor. Such causes may include, but are not restricted to, acts of God or of the public enemy, acts of the government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather; but in every case the failure to perform must be beyond the control and without the fault or negligence of the contractor. In such case contractor must provide prompt written notice to the contracting officer; the contracting officer, at his option may accept late, partial or substituted performance, or may terminate the contract in whole or in part effective immediately upon receipt of written notice by contractor.

(R4, tab 1 at 15-16)

7. The contract contained a "Termination" clause, stating, in part:

> TERMINATION
>
> Relative to termination of this contract, it is mutually agreed:
>
> a. This contract may be terminated in whole or in part by either party immediately upon written notice to the other party in the event of breach of this contract by the other party.

3

> b. . . . . All other concession contracts may be terminated in whole or in part by either party upon a minimum of thirty (30) days' [sic] notice, in writing to the other party. . . .

(R4, tab 1 at 12). Additionally, the contract also contained the following:

> NONWAIVER OF DEFAULTS
>
> Any failure by the Exchange at any time to enforce or require strict performance of any terms or conditions shall not constitute waiver thereof, and shall not affect or impair such terms or conditions in any way or [sic] the Exchange's right at any time to avail itself of such remedies as it may have for any breach or breaches of such terms or conditions.

(R4, tab 1 at 14)

8. Attached to the contract is a Verification of Proposal signed by Mr. Kostas that stated:

> I acknowledge that I have been requested to demonstrate my ability to perform any resulting contract at the price and fees in my proposal, and I certify that I have reexamined the basis for my proposal, including the price and fees. Based on my reexamination, I certify and confirm that I can and will perform any contra[c]t awarded on my proposal.

(R4, tab 1 at 44)

9. Between March 6 and March 8, 2019, numerous emails were exchanged between the parties. The contracting officer provided the contract award document to Kostas, and the parties discussed the contract. (R4, tab 2)

10. On March 7, 2019, eight days before the contract start date, Mr. Kostas emailed the contracting officer that his flight was landing in South Korea on March 11. Still, he needed assistance on where Camp Humphreys base was in relation to the airport and where the nearest city was located (R4, tab 2 at 6-7).

4

11.  The contracting officer responded the same day and expressed concern about Mr. Kostas's arrival date and whether Mr. Kostas would be able to commence on time with the required documents, foodservice truck, and supplies:

> This is concerning to me since the service should start on 15 Mar 2019.  Will you be able to commence on time?  Will you have the required documents, food truck and supplies to start?  Please coordinate with the service business manager.

(R4, tab 2 at 6)

12.  Mr. Kostas responded the same day, stating that he still needed to obtain the foodservice truck, permits, and licenses:

> [A]s you know i am coming from Europe.  If i ship my mobile canteen to Korea at least needs 3-4 months to arrive.
>
> As i want to open the soonest possible, i have no other solution than to buy a new one from the local market and the equipment will be sent by plain.
>
> I am coming to arrange my paper work for the business license and to buy the mobile canteen.

(R4, tab 2 at 5) (punctuation and syntax in original)

13.  On April 16, 2019, in response to Mr. Kostas's email to the contracting officer asking for assistance in filling out forms to obtain a business license (required for performance), the contracting officer responded the same day:

> Mr. Kostas,
>
> Our contract agreement is the only form that I or anyone at the Exchange completes.  When you submitted your proposal, you stated that you have taken into consideration on how to do business here in Korea and food sources.  It is your responsibility to get a business license.

5

> The contract commencement date was 15 March 2019 and
> I understand that we awarded the contract on 5 March.
> Please let me know when will you commence service.

(R4, tab 4 at 2)

14. The Services Business Manager for the USAG Humphreys Exchange Service Office sent an email to Mr. Kostas on May 21 and again on May 28, 2019, asking to "let me know when your truck [will] be ready to get inspection" (R4, tab 8 at 1-2).

15. The parties exchanged more emails through June 2019 concerning when the foodservice truck would be delivered at the base, whether the foodservice truck would be mobile or permanently installed, and utility access for electrical and water (R4, tabs 8 at 1, 9-12; 12 at 1-5).

16. On June 19, 2019, the Services Business Manager emailed Mr. Kostas asking when he would commence performance (R4, tab 14 at 1).

17. The same day Mr. Kostas replied to the Services Business Manager stating, "from my part i do everything i can to finish as soon as possible. . . I want also to start to provide my service the soonest possible. As you know the paperwork from Korean government takes time" (R4, tab 14 at 1) (punctuation and syntax in original).

18. In response to Mr. Kostas's June 19 email, the Services Business Manager asked if the start date could be amended from March 15, 2019, to July 31, 2019. They also asked Mr. Kostas to confirm when the foodservice truck would be ready for inspection, and to provide copies of certifications, and copies of the food source information for the menus. (R4, tab 16 at 1)

19. The next day, Mr. Kostas responded that he would like to commence work before July 31, 2019, but cautioned the food service truck had not arrived at the Incheon Port for inspection:

> I'll believe that i'll be able to start working earlier than
> 31st of July. Also, i want to start as soon as possible
> because this situation costs me too much money.
>
> . . .

6

The food trailer is on the way to Incheon port. When it'll arrive, the Korean customs will contact me to pick it up and i'll bring it straight on Base for inspection[.]

(R4, tab 17 at 1) (punctuation and syntax in original).

20. Mr. Kostas emailed the contracting officer on August 13, 2019, informing her that the foodservice truck had yet to clear South Korean customs and that he anticipated an inspection on/around August 30, 2019 (R4, tab 21).

21. By letter dated August 27, 2019, the contracting officer sent a Cure Notice to Kostas stating:

You are in default of your contract as follows:

a.      You failed to commence performance on 15 March 2019 as per Schedule, paragraph 2, Contract Period.

b.      You failed to commence performance on 31 July 2019 as per your request dated 26 June 2019.

The cure letter directed Kostas to commence performance no later than September 8, 2019, and provide documentation to the contracting officer within 5 calendar days of actions that it will take to preclude similar contractual non-compliance. The cure letter explained that failure by Kostas to comply with the contract may result in the contract being terminated for default. (R4, tab 23)

22. The parties exchanged numerous emails between August 27 and September 2, 2019, concerning the status of the foodservice truck and the requirements for Kostas to supply the appropriate licenses and certifications to the contracting officer (R4, tabs 24-26).

23. On September 10, 2019, two days after the identified start date in the Cure Notice, Mr. Kostas emailed the contracting officer to inform her that he had obtained a Korean business license. However, he was still working on obtaining a Korean work visa. (R4, tab 32 at 1) We find that appellant failed to meet the date to commence performance as directed by the Cure Notice.

24. The same day, the contracting officer responded to Mr. Kostas's email and stated that the Cure Notice commencement date had passed, and it was still uncertain

7

when or if he would be able to perform. The contracting officer stated she would terminate the contract:

> Please refer to the Cure Letter dated 27 Aug 2019. You [sic] company was required to commence service on 8 September 2019. Today is 10 September 2019, and you are just submitting the tax business license. Based on your email below, the commencement date is still unknown. This confirms that you have not cured the default and you are not in compliance with the contract terms still. I will follow our procedures in place for breach of the contract terms.

(R4, tab 33 at 3)

25. By letter dated September 23, 2019, the contracting officer terminated the contract for default. The letter advised that Kostas failed to remedy the deficiencies highlighted in the cure letter dated August 27, 2019, timely provide South Korean working visas, and to commence work by September 8, 2019. (R4, tab 34)

26. By letter dated October 2, 2019, but not received by the Board until October 7, Kostas appealed the contracting officer's September 23, 2019, decision. Kostas argued that the unexpected delays in obtaining permits, approvals, and the foodservice truck, were not his fault. The notice of appeal stated:

> At the time of signing the contract . . . I had to go to Korea to start all the legal procedures and buy the food trailer so that I could start offering my services to the US Army. . . .

> I have found that there is no factory producing food trailers in South Korea and therefore I would have to order, build and ship it from another country. So I ordered the food trailer from China. . . .

> The duration of construction of the food trailer was 2 months and then had to be shipped to Korea. The duration of the shipment and customs clearance were 2 months.

> . . .

8

> After customs clearance, I had to get license plates
> in order to get the business license, which was done.
>
> . . .
>
> the delay is not due to me but to the Korean state's
> procedures that I had to follow. . . .

27. Kostas filed its complaint dated December 9, 2019, contending that its default was due to complicated Korean immigration rules which caused lengthy delays (Compl. at 1).

28. By motion dated January 14, 2020, the government moved to dismiss the appeal for lack of subject matter jurisdiction "for failure to state a claim on which relief can be granted" as the Board "has no authority to grant injunctive relief" of an "extension of the Contract" (gov't mot. at 1, 4). The government argued that its motion is "dispositive of all the issues in the case" (*id.* at 1).

29. Following repeated Board Orders dated January 27 and March 2, 2020, providing Kostas an opportunity to respond to the government's motion to dismiss for lack of jurisdiction, Kostas responded in a letter dated March 5, 2020, containing a single paragraph stating that it has received its South Korean work permit and wished to start performance on the contract. Attached to the March 5 letter was a document titled "Visa Republic of Korea" for "Georgios Kostas" issuing a "Short-Term Working Visa" for a period of "90 days" starting February 17, 2020, and ending May 17, 2020. Kostas informed the Board and the government that he received his South Korean work permit and asked for an extension of its contract. (App. corr. ltr. dtd. March 5, 2020, ex. 1)

30. The Board issued a decision on the government's motion to dismiss on November 23, 2020, and found that while the Board does not possess jurisdiction over appellant's request for injunctive relief, the Board does possess jurisdiction over the termination for default. *Kostas Greek Food - Zorbas*, ASBCA No. 62213, 21-1 BCA ¶ 37,750.

31. By letter dated February 22, 2021, the parties elected to proceed under Board Rule 11, the appeal process by submission without a hearing, and proposed a joint schedule.

32. By Order dated March 2, 2021, the Board largely adopted the parties' schedule with minor modifications. The following schedule governed: conclusion of discovery (April 23, 2021), supplements to the record (May 3), objections (May 14), the parties to confer and make every effort to stipulate to facts that are not in dispute

(May 21), government's opening brief shall be filed (June 8), and appellant's brief shall be filed (July 8).

33. By motion submitted on May 3, 2021, the government moved to dismiss for failure to prosecute "due to appellant's lack of responsiveness to the government's discovery requests. . ." (gov't mot. at 1). The government argued that appellant has failed to provide any response to its interrogatories, requests for admissions, and production of documents with emails dated March 9, April 26, and May 3, 2021. The government argued that "Board Rule 17 allows the Board to issue an order to show cause why the appeal should not be dismissed with prejudice for failure to prosecute. Such an order may be appropriate 'whenever the record discloses the failure of either party to file documents required by these Rules, . . . or otherwise indicates an intention not to continue the prosecution or defense of an appeal'" (*id.* at 2). In the alternative, "the government request[ed] an Order to Compel Discovery from appellant. . ." (*id.* at 1).

34. By Order dated May 26, 2021, the Board highlighted the appeal history and appellant's failure to respond to the government's written discovery requests and multiple attempts by the government to engage appellant, "The government served written discovery on appellant on March 9, 2021, with a due date of April 23, 2021. Appellant has not responded, although several attempts were made by the government to engage appellant." The Order directed appellant to respond within 14 days whether it will respond to the government's motion to dismiss or advise whether it wishes to proceed with a decision under Rule 11 without filing its brief. The Order cautioned appellant that if it failed to respond, the Board would proceed to resolve the termination for default under Board Rule 11. (Bd. corr. ltr. dtd. May 26, 2021)

35. In response to the Board's Order dated May 26, 2021, the government stated "that it intends to file a brief in support of the termination for default" (gov't corr. dtd. June 11, 2021).

36. The government filed its Rule 11 brief on July 8, 2021. Appellant did not respond to the Board's May 26, 2021 Order.

DECISION

*1. Standard of Review*

Board Rule 11 permits parties "to waive a hearing and to submit [their] case upon the record." Pursuant to Board Rule 11, the Board "may make findings of fact on disputed facts." *Grumman Aerospace Corp.*, ASBCA No. 35185, 92-3 BCA ¶ 25,059 at 124,886 n.13. "[A] default termination is a drastic sanction which should be imposed (or sustained) only for good grounds on solid evidence." *J.D. Hedin Constr.*

*Co. v. United States*, 408 F.2d 424, 431 (Ct. Cl. 1969) (citation omitted). To ascertain whether there are good grounds to terminate a contract for default, "[t]he Government owes the contractor no less than an assessment of all the relevant circumstances when it exercises its discretion under the default clause." *L&H Constr. Co.*, ASBCA No. 43833, 97-1 BCA ¶ 28,766, at 143,556. The legal standards for a default termination are well established. Under the applicable contract clause, the contract can be terminated by either party in whole or in part in the event of a breach (finding 7). The government has the initial burden to prove that the termination for default was proper by a preponderance of the evidence. *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 763 (Fed. Cir. 1987); *Walsky Constr. Co.*, ASBCA No. 41541, 94- 1 BCA ¶ 26,264 at 130,624; *New Era Contract Sales, Inc.*, ASBCA No. 56661 *et al.*, 11- 1 BCA ¶ 34,738 at 171,022. Once the government has met its burden of demonstrating the appropriateness of the default, the contractor has the burden of proof that "its failure to perform was the result of causes beyond its control and without fault on its part." *Composite Int'l, Inc.*, ASBCA No. 43359, 93-2 BCA ¶ 25,747 at 128,126; *see also Int'l Elecs. Corp. v. United States.*, 646 F.2d 496, 510 (Ct. Cl. 1981); *ADT Constr. Grp., Inc.*, ASBCA No. 55358, 13 BCA ¶ 35,307 at 173,312 (citing *Empire Energy Mgmt. Sys., Inc.*, ASBCA No. 46741, 03-1 BCA ¶ 32,079 at 158,553); *Centurion Elecs. Serv.*, ASBCA No. 48750, 00-1 BCA ¶ 30,642 at 151,325.

### 2. The Parties' Contentions

The government argues that "[the government] terminated the concession contract after Zorbas failed to start performing on time, and after a six-month delay from the original contract performance start date" and that "appellant's failure to begin performance on time was not excused, and the contract clearly allocated the risks associated with performance to the appellant" (gov't br. at 2, 11). The government argues that "AAFES had been more than flexible with the Contract performance timeline in an effort to accommodate the difficulties Zorbas encountered in obtaining the necessary equipment and paperwork to be able to begin performance" when it extended the original start date from March 15, 2019 to July 31, 2019, and again to September 8, 2019 (*id.* at 12-13). The government argues that the Board lacks jurisdiction to consider an affirmative defense of excusable delay, "because [Kostas] never sought an excusable delay from the contracting officer" in the form of a claim and provided "'no evidence that [AAFES] was ever placed on actual notice of the specific number of days of extension that [it] would ultimately request' for the delays, or some subset thereof" (*id.* at 14) (quoting *ECC CENTCOM Constructors, LLC,* ASBCA No. 60647, 18-1 BCA ¶ 37,133 at 180,715).

Appellant failed to respond to the government's interrogatories, requests for admissions, and production of documents, the government's motion to dismiss, and the Board's Order dated May 26, 2021 (findings 34-36). However, based on appellant's

11

notice of appeal and limited complaint, we construe Kostas' excuse for non-performance relates to its delays in complying with Korean laws and procedures (findings 26-27).

### 3. The Termination for Default Was Proper

Should the government establish its prima facie case to justify the termination, "the burden shifts to the contractor to prove the default was excusable." *Truckla Servs. Inc.*, ASBCA Nos. 57564, 57552, 17-1 BCA ¶ 36,638 at 178,445 (citing *ADT Constr. Grp., Inc.*, ASBCA No. 55358, 13 BCA¶ 35,307 at 173,312). We agree that appellant failed to start performance on time (finding 23). It is undisputed that appellant was awarded a contract for a mobile kebab concession which required that all necessary permits, licenses, and equipment, including a self-contained mobile food unit, should have been obtained before the start of the period of performance, March 15, 2019 (findings 1-5). In addition, appellant certified in its proposal that it already had the necessary permits, licenses, and equipment and could perform the contract requirements (finding 8). It is also undisputed that appellant did not have the required permits, licenses, and equipment at either the time of the certification of its proposal, or at the performance start date of March 15, 2019. (findings 10-12). When appellant failed to begin performance on March 15, 2019, the government continued to work with appellant by providing an extension of time to obtain the necessary permits and licenses, and prepare for its arrival at Camp Humphreys (findings 13-15). Appellant requested the extension to July 31, 2019, and the government agreed (findings 16-19). Regrettably, Kostas failed to commence performance on July 31, 2019, and blamed unexpected delays on the Korean government (findings 20, 22). Despite numerous communications and a Cure Notice that Kostas needed to comply with the contract, Kostas failed to commence performance by September 8, 2019 (findings 23-25). Having failed to begin performance on time, the government established its prima facie case to justify the termination.

### 4. The Delay Was Not Excusable

The burden then shifts to Kostas to demonstrate that it is entitled to excusable delay. To establish that Kostas is entitled to excusable delay, it must demonstrate that the delay resulted from a cause which was unforeseeable, beyond the control of the contractor, and without fault or negligence by the contractor. *Sauer Inc. v. Danzig*, 224 F.3d 1340, 1345 (Fed. Cir. 2000). For example, on March 7, 2019, a week before the start date, Mr. Kostas admitted to the contracting officer that he did not have a foodservice truck and was starting to obtain licenses, permits, and work Visa (finding 12). Mr. Kostas admits his failure to start performance was due to "unexpected delays" in obtaining the necessary paperwork (findings 17, 19, 20, 22-23, 26-27). Appellant's failure to perform does not fall under unforeseeable, beyond its control, and without fault or negligence by Kostas. Similarly, the *Contractor Liability*

*Services* clause in the contract identifies the types of events that could eliminate liability on the contractor when the failure to perform results from such causes as "acts of God . . . acts of the government in either its sovereign or contractual capacity, fires, floods, . . . strikes, freight embargoes, and unusually severe weather . . . but in every case the failure to perform must be beyond the control and without the fault or negligence of the contractor" (finding 6). We conclude that Kostas's own negligence and lack preparedness does not excuse its failure to commence performance.

In addition to failing to commence performance, which would be sufficient for a proper termination for default, Kostas failed to obtain licenses and permits which were "material" contractual requirements. The government has the right to terminate a contractor for default if the contractor fails to perform any of the other provisions of the contract provided that they are "material" or "significant." *See Airport Indust. Park, Inc. v. United States*, 59 Fed. Cl. 332, 334-36 (2004) (termination of the contract for default was justified by contractor's failure to provide an adequate payment bond after surety which issued payment bond became insolvent.); *Quality Trust Inc.*, ASBCA No. 59983, 16-1 BCA ¶ 36,368 at 177,276-77 (the contractor did not secure performance and payment bonds and proper insurance for the contract as required); *Marshall's Elec., Inc.*, ASBCA No. 59749, 16-1 BCA ¶ 36,300 at 177,017 (the contractor's failure to provide bonding justified a termination for default); *L & M Thomas Concrete Co., Inc.*, ASBCA Nos. 49198, 49615, 03-1 ¶ 32,194 at 159,122-23 (the Board found the contractor's failure to provide a written quality control plan to assure it had an inspection system was support for a default termination); *Eng'r Tech. Consultants, S.A.*, ASBCA No. 43454, 94-1 BCA ¶ 26,586 at 132,301-02 (contract properly terminated when contractor failed to procure and maintain liability insurance); *M & T Co.,* ASBCA No. 38128, 93-3 BCA ¶ 25,926 at 128,949 (the government was justified in terminating the contract for default for failure to provide proof of the required insurance); *Urban Enterprises*, ASBCA No. 25567, 82-2 BCA ¶ 15,983 at 79,259 (contractor's failure to obtain the required health certificate for the food preparation equipment was sufficient grounds for default).

Here, the contract terms were clear, and Kostas verified that he was able to perform under the terms of the contract, including obtaining the necessary permits, licenses, and equipment (findings 1-5, 7-8). Nearly a year after the contract's performance start on March 15, 2019, and after Kostas appealed to the Board, he admitted that he still did not have the necessary paperwork to commence performance and only recently obtained a temporary South Korean work Visa for 90 days (finding 29). Kostas does not provide any reason beyond its own negligence. Kostas's attempt to start the process to obtain customs clearance (findings 12, 19-20), work visa (findings 17, 22-23), business license (findings 13, 23), and equipment inspections (findings 14, 20) a week before the contract start date were issues that were "foreseeable," within Kostas's control, and due to the fault and negligence of Kostas. These were the types of delays and issues the government wished to avoid by requiring

13

offerors to certify that they can perform the contract (finding 8) and the offeror had already obtained the required permits and licenses (finding 2). Substantial evidence in the record supports our conclusion that appellant's failure to commence performance was not unforeseeable and was due to his own negligence in failing to timely obtain the necessary permits, licenses, and equipment.

CONCLUSION

The appeal is denied.

Dated: October 13, 2021

STEPHANIE CATES-HARMAN
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 62213, Appeal of Kostas Greek Food - Zorbas, rendered in conformance with the Board's Charter.

Dated:  October 14, 2021

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals
